UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


J.A.S. (XXX-XX-4009)　　　　　　　　CIVIL ACTION NO. 16-cv-0558

VERSUS　　　　　　　　　　　　　　JUDGE FOOTE

U.S. COMMISSIONER SOCIAL　　　　　MAGISTRATE JUDGE HORNSBY
SECURITY ADMINISTRATION


## REPORT AND RECOMMENDATION

**Introduction**

　　J.A.S. ("Plaintiff") has a GED and past work experience that includes stints as a doctor's office receptionist, insurance receptionist, and telemarketer.  She had serious back problems and underwent six surgeries between August 2010 and June 2014.  She applied for disability benefits based on an assertion that she became disabled as of October 7, 2010, when she was 29 years old.

　　ALJ Richard LaFata held a hearing and issued a written decision (Tr. 63-76) that found that Plaintiff was seriously limited but could still perform the demands of her past jobs. The Appeals Council denied a request for review (Tr. 1-4) , which made the ALJ's decision final.  Plaintiff now seeks the limited judicial review that is available under 42 U.S.C. § 405(g).  For the reasons that follow, it is recommended that the Commissioner's decision be affirmed.

**Summary of Medical History**

　　Plaintiff had her first surgery in August 2010 when she was 29 years old.  She

complained of a two-month history of low back pain with left leg pain radiating down to the top of her foot. Physical therapy, injections, and other conservative therapy had not worked. MRI scans showed left L4-L5 herniated nucleus pulposus. Dr. David Cavanaugh performed a lumbar microdiscectomy at that site. Tr. 274-75, 283-85.

Dr. Anthony Sin examined Plaintiff several months later, in May 2011. He noted that Plaintiff had done well after her surgery until she slipped in a store. Plaintiff complained of left leg pain, left numbness and tingling, left leg weakness, and low back pain. Dr. Sin adjusted her medications and recommended a surgical procedure. Tr. 632-36. Plaintiff discussed that recommendation with Dr. Cavanaugh, who noted Sin's finding of a small amount of recurrent disc herniation and combined degenerative disc changes and the recommendation of a "minimally invasive TLIF at L4-L5." Dr. Cavanaugh counseled exhausting pain management before surgery, especially in light of the recent fall and what he believed was Plaintiff's low pain threshold. Tr. 302.

Plaintiff elected surgery, and Dr. Cavanaugh did a re-exploration in July 2011. Cavanaugh found no definite recurrent disc herniation but encountered and stripped away expected epidural fibrosis. Tr. 298. In the weeks afterward, Plaintiff made numerous phone calls to her physician to complain of significant problems and request more medications. She said she no longer had pain in her back, but she still had pain down her leg and numbness in her foot. Tr. 296-97.

Within days of the second surgery, Plaintiff reported to Dr. Cavanaugh with complaints of intractable back pain, and she was admitted for pain control. Tr. 262-63. Dr.

Marco Ramos performed a third surgery in September 2011. He performed an L4-L5 laminectomy, microdiscectomy, and foraminotomy. Tr. 401-02. By October 17, 2011, Plaintiff had improvements in the burning sensation in her lower back, was walking on her own without assistance, and seemed "very comfortable." She did complain of lower back pain non-radiating. Tr. 387.

By October 20, 2011, Plaintiff was "ambulating on her own power wearing high heels." Tr. 386. The same was mentioned at a visit on October 22, 2011. Tr. 384. Plaintiff later developed a wound infection that required additional care. Tr. 383. By November 3, 2011, the preoperative pain and weakness were no longer present, and Plaintiff was no longer taking pain relievers or muscle relaxants. Dr. Ramos recommended that she increase her activities in a gradual fashion. Tr. 382.

A week later, however, Plaintiff went to the hospital and was admitted for complaints of intractable pain. After discharge, she reported to Dr. Ramos and complained of constant lower back pain that radiated down the rear of her left leg, plus numbness in the entire left lower extremity. Examination showed a slightly reduced range of motion in her spine, a straight-leg raise test was positive on the left, and there was muscle weakness in the left leg and foot. Dr. Ramos prescribed medication. Tr. 381.

Plaintiff reported on February 6, 2012 that she had left hip pain radiating down her leg with numbness, and she could not do anything to make the pain subside. She had no recollection of any aggravating factor or incident that caused the worsening of her pain. She had been to the ER twice in the last week, and she repeatedly said that her pain was so bad

that she felt like she should kill herself. Tr. 377. Dr. Ramos reviewed a CT scan a few days later and saw only routine post-operative changes. He advised that Plaintiff increase her activities gradually and come back in four weeks. Plaintiff was walking in a normal pattern at that visit, and she had driven herself to the office in a standard car. Tr. 376.

Plaintiff reported at later visits that her condition continued to deteriorate, and her pain was no longer relieved with medications including Lortab, Neurontin, and morphine. Plaintiff said that her treating pain physician advised to proceed with another surgery, Tr. 372-74, and Dr. Ramos performed a fourth surgery on May 23, 2012. The procedure was a minimally invasive left laminectomy and microdiscectomy at L5-S1. Plaintiff initially claimed to be unable to move or feel her left lower extremity after the surgery, but she quickly regained movement and was discharged. Within a few days, she reported the resolution of some numbness but continuing numbness in another area. She was able to walk without assistance. Tr. 370. Plaintiff reported on July 9, 2012 that she had more numbness in the left lower extremity, and on July 31 she said there were days when her left leg pain was worse and prevented her from walking. Tr. 357-58. She reported at a September 4 visit continued numbness in the left leg with a tingling painful sensation, and muscle spasms at night. Her physician recommended physical therapy. Tr. 356.

Plaintiff continued to experience pain and numbness, which led to another MRI in January 2013. Tr. 351-55. The study showed extradural defects at L4-5 and left L5-S1 secondary mainly to scar tissue. A straight-leg raise test was positive on the left and negative on the right, and Plaintiff had limited range of motion of the lumbosacral spine. Plaintiff

could walk on her own and with a normal pattern, and she had no obvious weakness of the lower extremities, but she declined to attempt to walk on her tip toes and heels. Dr. Ramos discussed different options, including surgery, and Plaintiff elected a fifth surgery, a laminectomy and microdiscectomy. Tr. 351. Plaintiff reported significant improvement in her symptoms right after the surgery, but she still complained of left leg numbness. Tr. 349.

Follow-up visits included complaints of numbness and symptoms similar to the past. Plaintiff was able to walk on her own power without assistance, but she still took Lortab regularly for pain. She became pregnant in early 2013. Plaintiff reported in April 2013 that she also had cramping at night in her calf, and sometimes in her hamstring, and she could not wear tennis shoes because she could not lift the shoe to walk. The progress notes stated that Plaintiff seemed somewhat better and was accommodating to her condition. Tr. 345-48.

Plaintiff continued to have regular follow-ups with little change. She reported to Dr. Ramos in November 2013 that she began having burning and numbness in the left lower extremity about three weeks earlier. She had experienced it during her pregnancy, but it would come and go. She was able to walk on her own power without assistance, and she was carrying her nine-pound baby in a car seat carrier. Straight-leg raise tests were negative, but there was muscle weakness on the left lower extremity and a reduced left Achilles reflex. Tr. 578-79. An MRI in December 2013 showed a post-surgical change at L4-5 on the left, and multi-level lumbar spondylosis. There was also disc desiccation and mild bulging in various areas. Tr. 585.

Plaintiff was treated by Dr. Jefferey Adair for pain management. When he saw her in February 2014, she complained of constant pin pricking sensation in her left foot and said the shooting pain had returned. She had some difficult walking, and she reported her effort to get on disability. Dr. Adair wrote that he had tried injections, and they did not help much, and he did not think a repeat surgery would help much. He offered a spinal cord stimulation trial if Plaintiff was interested. He concluded, "I believe this is a chronic long-term issue for her." Tr. 610.

Dr. Milan Mody, a board certified spinal care specialist, examined Plaintiff in April 2014. He reviewed her medical history and conducted a physical examination. He observed left foot drop gait and noted that the left ankle inwardly rotate as Plaintiff walked. Straight-leg raise test was positive on the left. He believed that Plaintiff was a candidate for decompression and fusion L4-S1 to remove pressure on the nerve roots, but it was explained that the surgery should not be expected to lead to improvement in the left foot drop. Dr. Mody recommended consultation with a podiatrist or ankle specialist to evaluate the ankle mobility issues. Dr. Mody prescribed a left boot for the foot and ankle problem. He noted that Plaintiff was "at high risk of falls" because of her leg weakness and she had a baby to carry. Tr. 621-25.

Dr. Bharat Guthikonda performed an L4-S1 laminectomy in June 2014. Before the surgery, Plaintiff complained of acute exacerbation of left-sided leg pain. The physician advised that the history of surgeries made the risk of surgery higher, and she was advised on other options. Plaintiff chose surgery. Tr. 687-88. She later had to be hospitalized to treat

a related infection.  Plaintiff saw Dr. Adair in August 2014, a few days before her hearing.  She reported that her nerve pain was not improved since the last surgery, she had fallen since the surgery, and she still did not have much feeling in her left leg.  Straight-leg raise was positive on the left, and the range of motion was limited due to pain and stiffness.  Dr. Adair refilled her medications and noted that Plaintiff was "able to function and do the activities of daily living on the medication."  He added that he did not have much else to offer her other than medical management.  Tr. 866-67.

When Plaintiff returned to Dr. Guthikonda for a follow up in August 2014.  She reported that she tried physical therapy but did not feel better.  She complained of back pain and left leg burning.  A prescription issued for a rolling walker and a small four-prong walking cane, and Plaintiff was instructed to wear a leg brace when walking.  Tr. 712-14.

**Testimony**

Plaintiff testified at a hearing in August 2014.  She was then 33 years old, 5 foot 11 inches tall, and weighed about 250 pounds.  Plaintiff said her weight had ranged from 250 to 300 pounds, but her current weight had been normal for the last several years.  She also said her weight had not been an issue for her with respect to the jobs she had over the last years.

Plaintiff said she lived in a home with her husband, who has a full-time job monitoring surveillance equipment at a local casino, and her nine-month old son.  Plaintiff is the sole caregiver for her son during the work day.  She owns a car and is able to drive.  She even drove to the hearing.

Plaintiff testified that she had eight surgeries on her back within four years. Dr. David Cavanaugh did the first two, Dr. Marco Ramos did the next several, and the final was done by Dr. Guthikonda in June 2014. Plaintiff said the surgeries were on her low back area, to address degenerative disk disease and spinal stenosis. She said Dr. Jeffrey Adair, her pain management physician, told her that an MRI showed a great deal of scar tissue in her back. She continued to see Dr. Adair about every three months for pain medicines and a medicine to address nerve damage in her legs. Plaintiff said she had just started physical therapy two or three times a week.

Plaintiff said her current symptoms related to her lower back included a shooting constant aching pain in her lower back that radiated down to her left leg, into her kneecap, and down to the bottom of her foot. She said her whole foot hurt, and the left leg pain was a burning one, throbbing like pins and needles constantly. That caused her left foot to be weak and "flop around sometimes." That issue made it difficult for her to walk on uneven areas or rugs. She said she had fallen twice since her last surgery.

Plaintiff said she needed to wear a brace to help with foot drop, but she was not doing so because the brace must fit inside a shoe. She could wear only flip flops. Any other shoe, even a tennis shoe, was too heavy.

Plaintiff testified that her left leg and foot were so sensitive that even touch from light material such as bed sheets hurt. Plaintiff said the sensitivity preceded the most recent surgery, but the foot drop was diagnosed only recently.

Plaintiff said she could get relief by lying down on the couch or bed, which stretches her back and relieves some of the shooting pain in her leg. She said she spent "mostly all day" on the couch or bed, up to six to eight hours. She and her son stayed in the living room most of the day. The child had learned to crawl up on the couch for diaper changes; Plaintiff had a changing table but did not use it.

Plaintiff testified that she used to teach Sunday school, but she no longer attended church as often. When she did, she sat on the back row in case she had to get up and walk around. She estimated that she could walk about 50 feet, stand 5 to 15 minutes tops, and could not sit in a chair long at all. She estimated that she could lift 10 pounds comfortably. She said that it was "very painful" when she had to lift her 25-pound son.

Plaintiff once had a small business photographing weddings and babies. She said her back problems began when she was taking pictures for a friend at church. Her husband took her to the emergency room, and she was hospitalized, "and it just kind of progressed from there." Her other jobs included receptionist at an insurance agency ("just sitting there answering the phones all day"), and temporary jobs as receptionist with a variety of offices such as physicians and attorneys. She also worked similar receptionist jobs for an answering service and at a hospital. She mentioned other jobs of a similar nature.

Plaintiff's husband testified that, before he left for work, he would put out diapers, food, and other items that were staged near the couch or bed for Plaintiff. He also did most of the household chores, including cooking and cleaning. He corroborated Plaintiff's

testimony that she spent most of her time on the couch or in bed, that she had fallen twice recently, and had experienced drop foot.

**Summary of the ALJ's Decision**

The Social Security Act entitles certain "disabled" persons to disability benefits or supplemental security income benefits. The Act defines disabled persons as those who are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. The Act requires the Commissioner to establish by regulation uniform standards for the adjudication of claims. The Commissioner has promulgated regulations that include what is commonly referred to as the five-step sequential analysis. See 20 C.F.R. § 404.1520 (governing claims for disability insurance benefits) and § 416.920 (parallel regulations governing claims for supplemental security income).

The five-step process requires the ALJ to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity. The claimant bears the burden of showing he is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there are jobs that exist in significant numbers that the

claimant can perform. If, at any step, the claimant is determined to be disabled or not disabled, the inquiry ends. See Audler v. Astrue, 501 F.3d 446, 447-48 (5th Cir. 2007).

The ALJ found that Plaintiff did not engage in substantial gainful activity after her alleged onset date (step one). He also found that she suffered from degenerative disk disease, which is a severe impairment within the meaning of the regulations (step two) but not so severe as to meet or equal a listed impairment (step three) that would require a finding of disabled without consideration of the claimant's age, education, and work experience.

Before going from step three to step four, the ALJ must assesses the claimant's RFC by determining the most the claimant can still do despite his or her limitations. 20 C.F.R. §§ 404.1520(a)(4), 404.1545(a)(1). The claimant's RFC is used at steps four and five to determine if the claimant can still do past relevant work or adjust to other jobs that exist in the national economy. 20 C.F.R. § 404.1520(e), 404.1545(a)(5). The ALJ found that Plaintiff had the RFC to perform sedentary work[1], subject to additional limitations that she could only occasionally climb stairs/ramps, balance, stoop, kneel, crouch, and crawl, and she could never climb ladders, ropes, or scaffolds. She would also have to avoid unprotected heights, required the option to sit/stand at will, and she needed normal breaks.

---

[1]Sedentary work is the least demanding category of work activity recognized by the regulations. It involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. A sedentary job involves sitting, but a certain amount of walking and standing is often necessary to carry out job duties. A job is sedentary if walking and standing are required occasionally (up to a total of 2 hours per workday) and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a) and 416.967(a); Social Security Ruling 83-10.

Plaintiff applied for Title II benefits, which are based on claimant's prior earnings record. A person is only insured under the Title II program for a certain time after they last contributed a sufficient amount through income withholdings. Thus, the ALJ was focused on Plaintiff's ability to work between her alleged onset date of October 7, 2010 and June 30, 2014, the date she was last insured. The ALJ, based in part on testimony from a vocational expert, found that Plaintiff was capable of performing the demands of her past relevant work (step four) as a doctor's office receptionist, telephone operator, insurance receptionist, and telemarketer, all of which were classified as sedentary work. The ALJ made an alternative step five finding that Plaintiff could perform the demands of other jobs available in the economy, which the expert identified as document preparer and weight tester, both of which were also sedentary.

**Standard of Review; Substantial Evidence**

Plaintiff lists five assignments of error that will be discussed below. This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990). "Substantial evidence is more than a scintilla and less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Muse v. Sullivan</u>, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is justified only if there are no credible evidentiary choices or medical findings which support the ALJ's determination. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).

**Credibility Assessment**

Plaintiff argues that the ALJ failed to properly evaluate her credibility because the ALJ used only boilerplate findings. The regulations require the ALJ to make a finding about the credibility of the claimant's statements about her symptoms and their functional effects. It is not sufficient for the adjudicator to make a single, conclusory statement that allegations or testimony are not credible; the decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to allow reviewers to assess the weight the ALJ gave to the claimant's statements. Social Security Ruling 96-7p (Superseded by SSR 16-3p effective March 28, 2016).

The ALJ cited the relevant Ruling for assessing Plaintiff's impairments and whether they could reasonably be expected to produce the pain or other symptoms claimed. He noted that he must make a finding on the credibility of statements about the intensity or limiting effects of pain or other symptoms if not substantiated by objective medical evidence. Tr. 66. The ALJ then proceeded to review in great detail Plaintiff's lengthy medical history and her reports to her physicians about her symptoms and other conditions. Tr. 67-72. He then described the testimony of Plaintiff and her husband about her various limitations and abilities. Tr. 72. The ALJ determined that the medical records and reports did not provide a basis to support a conclusion that Plaintiff was totally incapable of working. He recognized that Plaintiff had undergone numerous surgical procedures on her back and that she had residual symptoms as a result, but he noted that Plaintiff was capable of taking care of her personal grooming needs, performing chores, driving, and caring for her infant child. He

noted testimony of Plaintiff having fallen "on occasion" and that Dr. Mody wrote that Plaintiff would be prone to falling because of her foot drop, but the ALJ saw no evidence in the medical records to indicate that Plaintiff "fell frequently prior to her visit with Dr. Mody." Tr. 72.

Plaintiff takes issue with the ALJ's descriptions of her fall history; she points to her report of a fall to Dr. Cavanaugh in 2011 and to Dr. Adair in August 2014 (Tr. 866), and she cites reports of falls to Dr. Guthikonda in August 2014 (Tr. 656) and reports of multiple falls to Dr. Adair in October 2014 (Tr. 864). Plaintiff saw Dr. Mody in April 2014, so the ALJ was correct that there was no evidence Plaintiff fell frequently before that visit. It must be kept in mind that the ALJ was focused on Plaintiff's condition prior to the expiration of her insured status on June 30, 2014. Later developments were of limited relevance.[2]

The ALJ noted that Plaintiff was often described as able to walk with a normal gait, and he wrote that there was "no medical evidence in the record documenting that the claimant cannot wear shoes." Tr. 72. Plaintiff points to her report at one visit that she could not wear tennis shoes because she could not lift her shoe, but that is not the same as objective medical evidence of the inability to wear shoes. The ALJ also pointed to a post-hearing report and noted that it did not include a report of any problems with wearing shoes. Tr. 73.

---

[2] Torres v. Shalala, 48 F.3d 887, 894 (5th Cir. 1995) (evidence showing degeneration of condition after insured status expired was not relevant); Owens v. Heckler, 770 F.2d 1276, 1280 (5th Cir. 1985) ("Any impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability.")

Plaintiff takes issue with the ALJ's statement that the "medicals frequently refer to the fact that back pain is not a significant issue." Tr. 74. The ALJ noted this after commenting that pain medication seemed to control Plaintiff's pain and allow her to function to a limited degree. Plaintiff points out that she was hospitalized twice for complaints of intractable back pain. That is true, but there are multiple references in the medical records to Plaintiff stating that she did not have significant back pain. Her principal problem was pain and numbness in her left leg and foot. Plaintiff certainly complained of back pain at times, but the ALJ's description of the medical reports was accurate.

Plaintiff faults the ALJ's written decision, which is one of the more detailed ones to come before the court, for not including sufficiently specific explanation of why the ALJ discounted Plaintiff's credibility. For one thing, the ALJ did not completely disregard Plaintiff's complaints. He found that she was limited to the least demanding category of work (sedentary) *and* had additional limitations. Thus, he credited Plaintiff's complaints to a great degree. He did so after a thorough analysis of relevant medical records and testimony, and his opinion is a reasonable assessment of that evidence.

An ALJ need not specifically discuss every factor set forth in the regulations to withstand judicial review of a credibility assessment regarding a symptom. Hillman v. Barnhart, 2006 WL 690879 (5th Cir. 2006). And if an ALJ has substantially complied with the regulations in the assessment of the claimant's credibility, that decision is entitled to judicial deference. Johnson v. Bowen, 864 F.2d 340, 347 (5th Cir. 1988); Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994); Clary v. Barnhart, 214 Fed. Appx. 479, 482 (5th Cir. 2007)

("The ALJ is *not* required to mechanically follow every guiding regulatory factor in articulating reasons for denying claims or weighing credibility") ; and <u>Undheim v. Barnhart</u>, 214 Fed. Appx. 448, 451 (5th Cir. 2007) ("An ALJ is not required to follow formalistic rules when articulating the reasons for his credibility determination"). The ALJ's opinion sets forth sufficient reasons to substantially comply with the regulations and allow meaningful judicial review, so this issue does not provide grounds for reversal.

**Obesity**

Plaintiff argues that the ALJ did not adequately consider the effect of her obesity. Social Security Ruling 02-1p explains that obesity is a risk factor that increases a person's chances of developing impairments in most body systems. For example, it complicates cardiovascular, respiratory, and musculoskeletal systems, and it increases the risk of impairments such as diabetes and hypertension. The Ruling states that the Agency "will consider obesity" at each of the five steps of the sequential analysis.

With regard to evaluating obesity when assessing the RFC and deciding steps four and five, the Ruling states that obesity can cause limitation of function, which depends on many factors, including where the excess weight is carried and what particular problems it causes or aggravates. A person may have obesity-related limitations of functions such as sitting, standing, or walking, or she may be unable to manipulate objects because of fatty tissue in the hands and fingers. She may have sleep apnea or be unable to tolerate extreme heat. The Ruling states: "As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations."

Plaintiff testified at her hearing in August 2014 that she was 5 foot 11 inches tall and weighed 250 pounds. The ALJ asked if "looking over say the last five or seven years or so, maybe the last 10 years, is that pretty much a range in which your weight typically is, typically averages?" Plaintiff said her weight had gone up to 300 (at an unspecified time), but she agreed that 250 pounds was "pretty much a normal weight" for the last five or seven years. Plaintiff somehow construes this as asking Plaintiff to speak to her weight in 2007 to 2009, which was before her first surgery in 2010. He faults this questioning for not looking to her ability after her alleged onset date in October 2010.

The ALJ did ask Plaintiff "to focus with regard to weight prior to the date you said you were disabled," and he asked her if her weight had been an issue with respect to her jobs and taking care of her personal needs. Plaintiff testified that it had not been an obstacle. Tr. 91-92. This does not indicate, however, that the ALJ looked only to Plaintiff's condition before her onset date. A fair reading of the entire inquiry is that he asked her about her weight during her insured period after the alleged onset date. Once it was established that her weight had been about the same for several years, the ALJ asked about whether it had interfered with Plaintiff's ability to work when she was employed (which was necessarily before the onset date.)

The ALJ's written decision made specific note of Ruling 02-1p and said that its considerations had been taken into account in reaching a decision, even though no medical source had specifically attributed any additional or cumulative limitations to Plaintiff's obesity. Tr. 65-66. The ALJ's assessment of this issue is supported by substantial evidence,

so there is no basis to reverse the decision on this ground. Furthermore, Plaintiff has not identified any limitation caused by her obesity that is not reflected in the RFC and that would prevent her from performing her past sedentary receptionist jobs. <u>Heck v. Colvin</u>, 674 Fed. Appx. 411, 414 (5th Cir. 2017) (absent identification of additional work-related limitations resulting from migraines, any failure of ALJ to specifically consider migraines as an additional impairment could not provide a basis for reversal).

**Physician's Statement**

The ALJ noted in his opinion: "Despite all of her treatment and complaints, none of the claimant's physicians has indicated permanent disability or the inability to work." Plaintiff argues that the ALJ wrongfully required that she produce a statement from her physician that she was disabled. The argument is not grounds for reversal.

The medical opinions of treating physicians are important in assessing a disability claim. However, it is the ALJ's role to decide the legal issue of whether the claimant is disabled within the meaning of the regulations. Accordingly, a statement by a physician that a claimant is "disabled" or "unable to work" does not mean that the Agency will determine that the claimant is disabled. 20 C.F.R. § 404.1527(d). If a physician does offer such an opinion, the regulations state that the Agency "will not give any special significance" to it. <u>Id</u>.; <u>Frank v. Barnhart</u>, 326 F.3d 618, 620 (5th Cir. 2003).

The ALJ did not, as Plaintiff suggests, require that she produce an opinion from a physician that she was disabled. The ALJ merely made the observation that there was no such opinion, as part of his summary of the issues, which concluded with the finding that the

"totality of the evidence" suggested that Plaintiff could perform work, albeit at a limited RFC. Tr. 74. The worth of the statement is debatable given the lack of weight that could have been afforded such a legal opinion if a physician had offered one, but a one-time observation that there was no such opinion or limitation declared by a physician neither (1) constituted a requirement that Plaintiff produce such an opinion to prevail nor (2) deprived the final decision of substantial evidence.[3]

**Medical Devices**

The ALJ found that Plaintiff was limited to sedentary work, with other limitations that included a requirement for a sit/stand option at will. The ALJ did not include a limitation that Plaintiff must be able to use a walker or a cane. Plaintiff points out that Dr. Guthikonda, in August 2014, prescribed a rolling walker and a four-prong walking cane, and he instructed Plaintiff to wear a leg brace when walking. Tr. 712-14.

Social Security Ruling 96-9p provides guidance on matters including additional limitations that limit the ability to do less than a full range of sedentary work. Additional limitations include medically required hand-held assistive devices. The Ruling states that to find a device is medically required, there must be medical documentation establishing the

---

[3] The medical records often contain physical capacity assessment forms completed by physicians with specific findings of the ability to lift, sit, stand, etc. Those findings are afforded significant weight, and the ALJ may have been noting, in shorthand fashion, the lack of an assessment form in the record that indicated an inability to perform even sedentary work.

need for the device to aid in walking or standing, and describing the circumstances for which it is needed.

The ALJ noted that Plaintiff had been prescribed a walker and a cane, "but the medical necessity and purpose for the prescribing (of) the devices was not provided in the report." The ALJ added that Plaintiff had written in a February 2013 report that she had been prescribed a walker and cane in the past, but she was not using them at that time. He also noted that the recent reports did not indicate that Plaintiff was restricted from walking; the report actually instructed that Plaintiff walk while using her leg brace. Tr. 73-74.

Plaintiff argues that the ALJ wrongfully required a statement from a physician that the device was necessary. The context of the opinion does not support this argument. The ALJ did not—based on the lack of a full explanation of need by a physician—simply dismiss the contention that Plaintiff needed to be able to use a cane or walker at work. Rather, the ALJ looked to all of the medical records, Plaintiff's own statements, and her activities to discount the claim.

The ALJ added that Ruling 96-9p explains that the use of a hand-held assistive device often does not erode the unskilled sedentary occupational base because such jobs have very little demand for lifting, and what minor lifting is required (files, ledgers, etc.) can usually be accomplished with one hand. He opined that such a device would not appear to affect the ability of Plaintiff to perform the sedentary jobs identified by the vocational expert, and Plaintiff has not offered argument to the contrary.

To the extent there was any error with respect to this issue, there is no indication that it would change the result. Procedural perfection is not required, and a harmless error standard applies in Social Security cases. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir.1988); Morris v. Bowen, 864 F.2d 333, 335-36 (5th Cir.1988). The court should not vacate a decision based on a potential procedural flaw unless the substantial rights of a party have been affected. Palomo v. Barnhart, 154 Fed.Appx. 426, n. 13 (5th Cir. 2005). The ALJ's remarks about the handheld devices have not been shown to merit reversal.

Accordingly,

**IT IS RECOMMENDED** that the Commissioner's decision be affirmed.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to

proposed factual findings and legal conclusions accepted by the district court.  See Douglass

v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 2nd day of August, 2017.

Mark L. Hornsby
U.S. Magistrate Judge